**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**JAMES WEST,**

       **Petitioner,**

                              **Case No. 2:23-cv-1597**

**v.**

                              **Sargus, J.**

**CHARMAINE BRACY, Warden,**      **Litkovitz, M.J.**

       **Respondent.**

**REPORT AND RECOMMENDATION**

Petitioner, James West, has pending before this Court a habeas corpus petition pursuant to 28 U.S.C. § 2254. This matter is before the Court on the Petition (Doc. 1) and Petitioner's Brief in Support ("Pet'r Br.") (Doc. 1-1), the state court record (Doc. 6), Respondent's Return of Writ (Doc. 7), and Petitioner's Traverse (Doc. 10). For the following reasons, the Undersigned **RECOMMENDS** that Petitioner's claim be **DENIED**, and this action be **DISMISSED**. The Undersigned further **RECOMMENDS** that a Certificate of Appealability ("COA") be issued as reasonable jurists could disagree with the outcome that Petitioner's ground for relief lacks merit.

**I. FACTUAL BACKGROUND**

The factual history underlying the state court judgment against Petitioner was set forth by the Supreme Court of Ohio as follows:

> **{¶ 5}** On October 2, 2017, Patrick Akers drove to the Beverage Warehouse in the South Linden neighborhood in Columbus to buy a bottle of liquor. His friends Donovan Banks and "Reese" followed him to the store in a separate car, a Dodge Charger, and waited outside. Inside the store, Akers saw Reese's girlfriend "Nay" and joined her in line.

> **{¶ 6}** West was standing beside Nay at the cash register, and Akers asked if he was in line. West suggested that Akers could go first if Akers "put[] $20 on his bottle," i.e., paid for part of West's purchase, but Akers did not understand him.

According to Akers, West became belligerent after Akers asked him what he meant, and West mentioned having ammunition in his car.

{¶ 7} West swatted Akers with an open hand, knocking Akers's hat to the side, and Nay and other customers tried to separate them and deescalate the situation. Akers left the store, and West pushed through Nay and other customers who were trying to keep him from following Akers outside.

{¶ 8} As Akers walked away from the store, he signaled Banks and Reese to come over and, according to Akers, warned them that there was "static." Two passengers in West's car, "D" and an unidentified man, got out of the car and approached Akers in the parking lot while Reese got out of the Charger and joined Akers.

{¶ 9} The unidentified man punched Akers, Reese punched West, and then D punched Reese. According to Akers, D had two handguns, both of which "fell from his waist and hit the ground" during the fight. D picked up both guns. Banks then got out of his Charger, and Akers and Reese moved behind him. West, D, and the unidentified man approached the Charger, and after D hit Banks, West's group backed away.

{¶ 10} Once the two groups were separated by at least a car length, West took a handgun from D and fired shots toward the Charger's front driver's side until he expended the clip. Akers took cover at the rear passenger's side of the Charger while Banks and Reese ran from the parking lot. As West finished shooting, D ran from the scene, turning to fire shots toward the passenger's side of the Charger where Akers was taking cover. Akers was shot twice in his right leg.

{¶ 11} West drove away moments before officers from a nearby police substation arrived on the scene and secured the area. In the hospital, Akers picked West and another person from a photo array. West agreed to be interviewed by detectives, and he gave a statement in which he admitted that he had had a confrontation with Akers at the Beverage Warehouse and that someone had punched him in the parking lot. West told the detectives that he had been by himself and that after he heard gunshots, he jumped in his car and drove away. West denied having had a firearm and denied having shot at anyone.

{¶ 12} The grand jury returned a three-count indictment charging West with two counts of felonious assault, each with a firearm specification, and one count of having a weapon while under a disability. At trial, the state presented the testimony of Akers, the officers who had responded to the scene, and the detectives who had interviewed West. The state also presented evidence of West's prior convictions and security-camera footage from the Beverage Warehouse showing the altercation and shooting from multiple angles.

2

{¶ **13**}  Against the advice of defense counsel and over the admonishment of the judge, West testified on his own behalf.  He explained that while he was in line to buy a bottle of liquor and speaking to Nay, Akers approached and asked why he was speaking to her.  Akers then asked to pass him in the line, and West told him that he could, if Akers gave him $20.  An argument ensued, and West antagonized Akers by calling him "broke" and saying, "Most broke people can't fight."  He also showed Akers cash that he had pulled from his pocket and said, "Look, you'll never get this much money."

{¶ **14**}  West testified that when he produced his cash, Akers said, "I'm going to take that shit from you."  West then proceeded to narrate the security-camera footage of this encounter; he concluded his narrative in time with the footage of him pulling his money out in front of Akers and the comment Akers made in reply.  The judge then asked West, "So you're claiming that he said he would rob you," and West responded, "Yeah.  His actual words was, 'I'm gonna take that shit,' is what he said to me."  West testified, "[Akers] said he was going to his car after he said he was going to rob me," and the judge asked, "He didn't say he was going to rob you.  You thought that's what he was implying by saying * * * 'I'm going to take your money'? "  West responded, "He said, 'I'm gonna take that shit.' "

{¶ **15**}  West testified that when Akers left the store, Akers signaled to his friends and yelled to them, "I got something for us," not "[w]e got static."  As West narrated the security-camera footage of the action in the parking lot with a laser pointer, defense counsel asked West where he was, and West replied, "I'm right here.  I'm being struck."  The judge then inquired, "Is that you?"  West confirmed, "Yeah, that's me getting struck, and that's Akers right there trying to strike me, too."  West narrated additional security-camera footage of the scene from a different angle, after which the judge asked him, "Is that you with the gun, shooting?"  West admitted, "That is me with the gun, shooting."

{¶ **16**}  West testified that he had acted in self-defense, asserting that when Reese punched D, both men dropped a firearm.  He also claimed that when the driver of the Charger—Banks—got out of his car, he had a firearm.  West explained that he retreated when he saw Banks with a gun and that he then took a handgun from D and began shooting, stating "I was in fear for my life at that point."  West also testified that he had not intended to kill anyone: "I was aiming at the ground for real.  I wanted everybody to get out of the vicinity.  I didn't want to get shot with all the guns falling out.  I was shooting at the ground, trying to get away."

{¶ **17**}  During cross-examination, West admitted that getting punched had made him mad and that he had then pursued Akers's group to fight.  When the prosecutor stated that he was wrapping up, the judge asked the prosecutor, "Did he

3

make a statement to a police officer?"  The prosecutor, who had not covered this topic during cross-examination, responded, "He did," and then began questioning West about the statement he had made to police:

> Q. All this happened.  It's all on video.  We clearly see you shooting.  You made a statement to the cops, didn't you?
>
> A. Yes, sir.
>
> Q. And, of course, you told them you had a gun and were shooting because these guys brought a gun into the situation?
>
> THE COURT: You lied to the police, didn't you?
>
> THE DEFENDANT: Because I wanted to give myself a fighting chance at court.
>
> * * *
>
> Q. Okay.  You said, "There was some shooting, but it wasn't me," right?
>
> A. I just told you what I said. I didn't have a lawyer present, so why would I plead to anything?
>
> THE COURT: It wasn't a question of pleading.  You waived your right, and you made a statement to the police.  You didn't tell them it was self-defense at that time.  It's just that simple, right?
>
> THE DEFENDANT: Yes, sir.

West did not object to any of the court's questioning.

{¶ 18}  After the close of evidence, the judge gave the following instruction to the jury:

> The next part is important.  Sometimes I ask questions.  However, any question that I ask or any tone in my voice, because I can get aggravated, don't take that as any indication of how I think the case should come out.
>
> How I think a case should come out has no bearing on anything.  Don't place any emphasis on any questions I asked, and don't put any emphasis on why I asked a question.  It doesn't matter.

4

What matters is your evaluation. If I did anything, disregard it.

{¶ 19} The jury found West guilty of both counts of felonious assault and the associated firearm specifications, and the trial court found him guilty of having a weapon while under a disability, a count that had been tried to the bench. At sentencing, the judge noted his belief that West had lied on the witness stand and that he was on drugs on the night of the incident, but he imposed the same aggregate amount of prison time that was offered to West at plea-bargaining even though the state had recommended a longer sentence after the trial. The judge sentenced West to four years in prison for the felonious assault of Akers, two years for the felonious assault of Banks, and three years each for the firearm specifications, all to be served consecutively. The judge also sentenced West to three years in prison for having a weapon while under a disability, to be served concurrently with the other terms of incarceration, for an aggregate 12-year prison sentence.

{¶ 20} The Tenth District Court of Appeals affirmed. The court rejected the argument that the trial court exhibited bias in questioning West at trial and therefore committed structural error. Instead, the court of appeals applied the plain-error standard of review to determine whether West had been prejudiced by the judge's questioning. The appellate court concluded that West had not demonstrated plain error, because "when viewed in the context of the record as [a] whole, the trial court's questions were limited, and came only after the trial court gave specific warnings to West regarding testifying against his attorney's advice and the effect that would have on his case. * * * And finally, any arguable problem was cured by the trial court's curative instruction." 2020-Ohio-3434, ¶ 17.

*State v. West*, 200 N.E.3d 1048, 1050-53 (2022); (Doc. 6, at PageID 230-35).

## II. PROCEDURAL HISTORY

### Franklin County Trial Proceedings

Petitioner was indicted in the Franklin County Court of Common Pleas on November 6, 2017, on two counts of felonious assault in violation of Ohio Rev. Code § 2903.11—felonies of the second degree, both with a three-year firearm specification in violation of Ohio Rev. Code § 2941.145(A). (Doc. 6, at PageID 42, 62). Petitioner was also indicted on one count of having weapons while under disability in violation of Ohio Rev. Code § 2923.13—a felony of the third degree. (*Id.* at PageID 43). The two counts of felonious assault with firearm specifications were

tried to a jury, and Petitioner opted for a bench trial for the one count of having weapons under disability, waiving a trial jury. (*Id.* at PageID 48).

On January 16, 2019, the jury found Petitioner guilty on both counts of felonious assault, each with the firearm specifications, and the trial judge found Petitioner guilty of having weapons while under disability. (*Id.* at PageID 48-50). The next day, Petitioner was sentenced to a term of imprisonment of four years on count one and two years on count two, both with three years for the firearm specifications, to be served consecutively, and three years on count three to be served concurrently, for a total term of imprisonment of twelve years.[1] (*Id.* at PageID 48-49, 123; Doc. 6-3, at PageID 800). Petitioner, proceeding *pro se*, filed a notice of appeal on February 13, 2019. (Doc. 6, at PageID 53 (showing that the Notice was signed January 26, 2019, notarized January 31, 2019, and docketed February 13, 2019)).

### Direct Appeal

Petitioner, through counsel, filed an appellate brief in the state appellate court on July 1, 2019, raising the following three assignments of error:

> First Assignment of Error: The appellant's trial was tainted by structural error when the court violated Mr. West's Sixth Amendment right to be tried by an impartial judge.
>
> Second Assignment of Error: The appellant's right under the Sixth and Fourteenth Amendments and Article I, Sections 10 and 16 of the Ohio Constitution to present a defense was violated when the court refused to permit a witness to testify by immediately imposing the most severe sanction permissible for a discovery violation.
>
> Third Assignment of Error: The multiple violations of Mr. West's Constitutional rights rise to the level of cumulative error.

---

[1] The Court notes the sentences laid out in the trial court's judgment entry and the trial transcript do not align with the specific sentences for each count, but the total term of imprisonment equals twelve years in both. (*Compare* Doc. 6, at PageID 48-50, *with* Doc. 6-3, at PageID 800).

(Doc. 6, at PageID 60).  On June 23, 2020, the state appellate court issued an Opinion overruling Petitioner's assignments of error and affirming the judgment against him.  (*Id*. at PageID 120-28).  One judge concurred in part but also dissented in part, disagreeing with the majority's judicial bias analysis.  (*Id.* at PageID 128-31).

On August 10, 2020, Petitioner, through counsel, filed a notice of appeal and memorandum in support of jurisdiction in the Supreme Court of Ohio, raising the following proposition of law:

> A criminal defendant's Due Process right to a fair trial under the United States and Ohio Constitutions is violated when the trial court engages in questioning that shows bias against the defendant.  Such error is subject to a structural error analysis and is grounds for automatic reversal.

(*Id*. at PageID 144-50).  On November 12, 2020, the Supreme Court of Ohio accepted jurisdiction over the appeal.  (*Id.* at PageID 166).  The Ohio Association of Criminal Defense Lawyers filed an amicus brief in support of Petitioner.  (*Id.* at PageID 186-97).  On May 11, 2022, the Supreme Court of Ohio issued an Opinion affirming the criminal judgment against Petitioner.  *State v. West*, 200 N.E.3d 1048 (2022); (Doc. 6, at PageID 229-40 (detailing majority opinion by Justice Kennedy, with Justices Fischer and DeWine concurring, and Chief Justice O'Connor concurring in judgment only)).  Three justices issued two dissenting opinions that disagreed with the majority's analysis.  (*Id.* at PageID 241-57 (dissenting opinion by Justice Donnelly); *id.* at PageID 257-64 (dissenting opinion by Justice Brunner, joined by Justice Stewart)).

### Federal Habeas Corpus

Exactly one year later, on May 11, 2023, Petitioner, through counsel, filed the instant

7

federal habeas corpus petition in this Court.  (Doc. 1).  Petitioner raises the following ground for relief:

> **<u>Ground One</u>:**  Due process is violated when the trial judge exhibits bias during questioning of a criminal defendant resulting in structural and plain error warranting a reversal.

(Petition, Doc. 1, at PageID 6 (referencing Pet'r Br., Doc. 1-1, Exhibit Brief in Support)).

## III.  THE HABEAS PETITION SHOULD BE DENIED

Petitioner claims that the trial judge exhibited bias in questioning Petitioner and through remarks made during trial.  (Petition, Doc. 1, at PageID 6; Pet'r Br., Doc. 1-1, at PageID 22-24). Petitioner maintains that the state courts unreasonably rejected this judicial bias claim. (Traverse, Doc. 10, at PageID 871-72).  Respondent contends that the state courts were not unreasonable in denying Petitioner's claim and finding that the trial judge did not exhibit bias. (Return, Doc. 7, at PageID 848-49).

### A.  Standard of Review: AEDPA Deference

The applicable standard of review governing the adjudication of constitutional issues raised by a petitioner is set forth in 28 U.S.C. § 2254(d) of the Antiterrorism Effective Death Penalty Act ("AEDPA").  Under the that provision, a federal court shall not issue a writ of habeas corpus on a claim that the state courts adjudicated on the merits unless the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2).  Section 2254(d)(1) circumscribes a federal court's review of claimed legal errors, while § 2254(d)(2) places

8

restrictions on a federal court's review of claimed factual errors.

Under § 2254(d)(1), a state court decision is "contrary to" Supreme Court precedent "when the state court confronts facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from its precedent" or "when the state court 'applies a rule that contradicts the governing law set forth in' Supreme Court cases." *Williams v. Coyle*, 260 F.3d 684, 699 (6th Cir. 2001) (quoting *Williams v. Taylor*, 529 U.S. 362, 406-07 (2000). A state court decision involves an unreasonable application of Supreme Court precedent if the state court identifies the correct legal principle from the decisions of the Supreme Court but unreasonably applies that principle to the facts of the petitioner's case. *Id.* A federal habeas court may not find a state adjudication to be "unreasonable" simply because the court concludes in its "independent judgment" that the relevant state court decision "applied clearly established federal law erroneously or incorrectly." *England v. Hart*, 970 F.3d 698, 710 (6th Cir. 2020) (quoting *Williams v. Taylor*, 529 U.S. at 410). Rather, to be deemed unreasonable, "the state court's ruling . . . [must be] so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

The Supreme Court has made clear that in assessing the merits of a constitutional claim under § 2254(d)(1), the federal habeas court must apply the Supreme Court precedents that controlled at the time of the last state court adjudication on the merits, as opposed to when the conviction became "final." *Greene v. Fisher*, 565 U.S. 34, 38-39 (2011) (citations omitted); *cf. Otte v. Houk*, 654 F.3d 594, 600 (6th Cir. 2011) (citing *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003)) (in evaluating the merits of a claim addressed by the state court, the federal habeas court

must "look to Supreme Court cases already decided at the time the state court made its decision"). Decisions by lower courts are applicable "to the extent [they] have already reviewed and interpreted the relevant Supreme Court case law to determine whether a legal principle or right had been clearly established by the Supreme Court." *Otte*, 654 F.3d at 600 (quoting *Landrum v. Mitchell*, 625 F.3d 905, 914 (6th Cir. 2010)). The writ may issue only if the application of clearly established federal law is objectively unreasonable "in light of the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state court decision." *McGhee v. Yukins*, 229 F.3d 506, 510 (6th Cir. 2000) (citing *Williams v. Taylor*, 529 U.S. at 411-12).

Further, § 2254(d)(2) prohibits a federal court from granting an application for habeas relief on a claim that the state courts adjudicated on the merits unless the state court adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). In this regard, § 2254(e)(1) provides that the findings of fact of a state court are presumed to be correct and that a petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." *Upshaw v. Stephenson*, 97 F.4th 365, 370 (6th Cir. 2024) (citations omitted).

Finally, the Supreme Court has clarified that in making the § 2254(d) "reasonableness" determination, a federal court in habeas corpus must confine its review "to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

**B. Ground One: Judicial Bias**

In his sole ground for relief, Petitioner asserts that the state trial judge exhibited bias against Petitioner "resulting in structural and plain error warranting a reversal," in violation of Petitioner's Fifth, Sixth, and Fourteenth Amendment rights. (Petition, Doc. 1, at PageID 6; Pet'r Br., Doc. 1-1, at PageID 17-24). Petitioner maintains that his right to a fair trial was violated when the trial judge showed the "appearance of impropriety and bias" while questioning Petitioner on the witness stand. (Doc. 1-1, at PageID 20).

In response to Petitioner's assertions, Respondent points out that the Supreme Court of Ohio analyzed this claim under the plain-error test because Petitioner failed to object to the issue at trial. (Return, Doc. 7, at PageID 842). Respondent contends that the Supreme Court of Ohio reasonably applied federal law in denying Petitioner's judicial bias claim. (*Id.* at PageID 848). Specifically, Respondent suggests that Petitioner "has not demonstrated that the trial court's conduct rises to the level of an exceptional case" because "[h]e does not show that the judge's questions reflected a 'deep-seated' or 'high degree' of antagonism that would make fair judgment 'impossible.'" (*Id.* (quoting *Liteky v. United States*, 510 U.S. 540, 555-56 (1994)) (footnote omitted)). Given the deference afforded to state court decisions under the AEDPA, Respondent maintains that the Supreme Court of Ohio was not unreasonable in finding that Petitioner was not prejudiced by the trial judge's questioning. (*Id.* at 848-49 (citations omitted)). Further, Respondent contends that if Petitioner is arguing that the state courts improperly applied Ohio's plain error test, then the claim is not cognizable under federal habeas review.[2] (*Id.* at

---

[2] The Undersigned notes that the Supreme Court of Ohio applied federal law in assessing this claim under *Johnson v. United States*, 520 U.S. 461 (1997), as explained in further detail below.

11

PageID 852 (citations omitted)).

In reply, Petitioner contends that the Supreme Court of Ohio was unreasonable in its application of the plain error test laid out in *United States v. Olano*, 507 U.S. 725 (1993). (Traverse, Doc. 10, at PageID 865-66). Petitioner maintains that the "judicial bias exhibited during [his] trial was a structural error that should have been corrected by the appellate courts in Ohio." (*Id.* at PageID 866). Petitioner takes issue with the trial judge's conduct from several points during his trial, including when "the trial court interjected to either bolster the state's case, to assist the case in its cross-examination, or to directly call into question [Petitioner's] credibility." (*Id.* at PageID 867). Petitioner asserts that the trial judge "blurred the lines between prosecutor and judge." (*Id.*). The "most egregious instance," Petitioner asserts, occurred when "the trial judge posed a question to the prosecutor, not the witness, as to whether [Petitioner] made a statement to the police," prompting a "new line of questioning from the prosecutor." (*Id.* at PageID 867-68).

The state appellate court overruled the assignment of error concerning judicial bias on direct appeal. (Doc. 6, at PageID 126). The state appellate court acknowledged that the trial court's questioning may have been "intemperate" but still concluded that it could not find plain error. (*Id.*). The state appellate court found that based on the record as a whole, the trial court's questioning of Petitioner was limited. (*Id.*). The court also noted that the curative instruction provided by the trial judge resolved any potential issues. (*Id.*). One judge dissented, noting disagreement with the majority's conclusion that the trial judge's conduct was acceptable, and finding that the misconduct "created structural error." (*Id.* at PageID 128-29).

The Supreme Court of Ohio affirmed the state appellate court's judgment, analyzing

12

Petitioner's judicial bias claim as follows:

### Plain, Harmless, and Structural Error

{¶ 22} " 'No procedural principle is more familiar to this Court than that a constitutional right,' or a right of any other sort, 'may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.' " *United States v. Olano*, 507 U.S. 725, 731, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), quoting *Yakus v. United States*, 321 U.S. 414, 444, 64 S.Ct. 660, 88 L.Ed. 834 (1944). When the defendant forfeits the right to assert an error on appeal, an appellate court applies plain-error review. *Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, at ¶ 21-22. Under this standard, the defendant bears the burden of "showing that but for a plain or obvious error, the outcome of the proceeding would have been otherwise, and reversal must be necessary to correct a manifest miscarriage of justice." *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 16. An appellate court has discretion to notice plain error and therefore "is not required to correct it." *Rogers* at ¶ 23.

{¶ 23} In contrast, when a defendant objects to an error at trial, an appellate court applies harmless-error review. *Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, at ¶ 15. Under that standard, the state "bears the burden of demonstrating that the error did not affect the substantial rights of the defendant." *Id.* As with plain error, "[w]hether the defendant's substantial rights were affected depends on whether the error was prejudicial, i.e., whether it affected the outcome of the trial," *Jones*, 160 Ohio St.3d 314, 2020-Ohio-3051, 156 N.E.3d 872, at ¶ 18. But "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). An appellate court is required to reverse the conviction when the state is unable to meet its burden. *Perry* at ¶ 15.

{¶ 24} This court has recognized that "when a defendant is represented by counsel and tried by an impartial fact-finder, there is a strong presumption that all errors—constitutional and nonconstitutional—are subject to harmless-error review." *Jones* at ¶ 19. Nonetheless, the United States Supreme Court and this court have held that certain errors cannot be deemed harmless. *E.g.*, *Weaver v. Massachusetts*, __ U.S. __, __ 137 S.Ct. 1899, 1907-1908, 198 L.Ed.2d 420 (2017); *Perry* at ¶ 17.

{¶ 25} Structural errors are "constitutional defects that ' "defy analysis by 'harmless error' standards" because they "affect[] the framework within which the trial proceeds, rather than simply [being] an error in the trial process itself." ' " (Brackets added in *Fisher*.) *Perry* at ¶ 17, quoting *State v. Fisher*, 99 Ohio St.3d

127, 2003-Ohio-2761, 789 N.E.2d 222, ¶ 9, quoting *Arizona v. Fulminante*, 499 U.S. 279, 309-310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). "Despite its name, the term 'structural error' carries with it no talismanic significance as a doctrinal matter. It means only that the government is not entitled to deprive the defendant of a new trial by showing that the error was 'harmless beyond a reasonable doubt.' " *Weaver* at ___, 137 S.Ct. at 1910, quoting *Chapman* at 24.

{¶ 26} Structural error has been recognized only in limited circumstances involving fundamental constitutional rights, including the denial of counsel to an indigent defendant, the denial of counsel of choice, the denial of self-representation at trial, the denial of a public trial, and the failure to instruct the jury that the accused's guilt must be proved beyond a reasonable doubt. *Id.* at ___, 137 S.Ct. at 1908; *United States v. Davila*, 569 U.S. 597, 611, 133 S.Ct. 2139, 186 L.Ed.2d 139 (2013).

*Judicial Questioning of the Accused*

{¶ 27} In questioning witnesses and commenting on the evidence, a judge may create "a risk of the appearance of bias." *State v. Cepec*, 149 Ohio St.3d 438, 2016-Ohio-8076, 75 N.E.3d 1185, ¶ 81. This court has therefore admonished judges that " '[i]n a trial before a jury, the court's participation by questioning or comment must be scrupulously limited, lest the court, consciously or unconsciously, indicate to the jury its opinion on the evidence or on the credibility of a witness.' " *Id.* at ¶ 72, quoting *State ex rel. Wise v. Chand*, 21 Ohio St.2d 113, 256 N.E.2d 613 (1970), paragraph three of the syllabus.

{¶ 28} West, however, failed to object to any of the trial judge's comments or questions in this case. Therefore, our review is for plain error only, as assertions of structural error do not preclude an appellate court from applying the plain-error standard when the accused has failed to object. *See Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, at ¶ 24; *Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, at ¶ 23; *Johnson v. United States*, 520 U.S. 461, 465-466, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997).

{¶ 29} Even assuming that the judge plainly erred in participating in West's cross-examination, West must still demonstrate a reasonable probability that the judge's error prejudiced him and that reversal is necessary to correct a manifest miscarriage of justice. *See Rogers* at ¶ 22.

{¶ 30} West has not established a reasonable probability that the judge's actions affected the outcome of the trial. The evidence of guilt was overwhelming. The store's security cameras captured West having an altercation with Akers, being held back by other customers, and pushing through them to follow Akers outside. West admitted that after being punched, he became mad and participated in the

fight.  When Akers and Reese retreated to the Charger, West pursued them. Although he claimed that Banks had a firearm, the security-camera footage shows no indication of it, and rather than seeking cover, D[3] punched Banks before West and his group started walking away.  Though in no apparent danger, West obtained a handgun from D, emptied the clip in Akers's direction from at least a car's length away, and then drove away as police arrived.  He then lied to the police about the shooting and failed to assert self-defense as he gave his statement.  This evidence contradicts West's claim that he acted in self-defense.

{¶ 31} The jury was able to gauge the credibility of West's testimony and compare his version of events with the security-camera footage documenting the shooting.  The jury was also instructed to disregard any inference it might draw from the judge's questioning and tone, and it is presumed that a jury follows the trial court's instructions, *State v. Treesh*, 90 Ohio St.3d 460, 480, 739 N.E.2d 749 (2001).  A review of the record demonstrates that no reasonable fact-finder could have examined the evidence and determined that West's assertion of self-defense was credible.  Therefore, there is no reasonable probability that any comment or question by the judge affected the outcome of this case.

{¶ 32} Both dissenting opinions recognize that plain-error review applies when a defendant has failed to object to an alleged structural error in the trial court. Nonetheless, they would reject the traditional outcome-determinative test of evaluating prejudice under the plain-error rule and hold that an appearance of judicial bias automatically affects a defendant's substantial rights.

{¶ 33} But their approach is inconsistent with that of the federal courts, which rely on the outcome-determinative standard in reviewing unpreserved claims of judicial bias.  Indeed, when such an error has occurred, courts applying plain-error review consider the likelihood that the outcome of the proceedings would have been different but for the judge's actions in questioning witnesses.  *See, e.g.*, *United States v. Barnhart*, 599 F.3d 737, 745-747 (7th Cir. 2010) (holding that although the judge's questioning constituted error, that error did not affect the defendant's substantial rights, because he failed to show that "but for the judge's improper questioning, he probably would not have been convicted"); *United States v. Rivera-Rodriguez*, 761 F.3d 105, 123 (1st Cir. 2014) (concluding that the case against the defendant was not strong and thus "[w]ithout [the judge's] improper interventions, there is a reasonable probability that [the defendant] would not have been convicted").

{¶ 34} The United States Supreme Court has also employed an outcome-determinative analysis when reviewing alleged structural defects for plain error.  In *Johnson*, the court considered the effect of a trial-court error in failing to submit an

---

[3] "D" was Petitioner's unnamed acquaintance who participated in the altercation.  (Doc. 6-3, at PageID 700, 710).

element of the crime to the jury.  520 U.S. at 467, 117 S.Ct. 1544, 137 L.Ed.2d 718.
The court concluded that even assuming that the error was structural, reversal was
unwarranted because the evidence supporting the omitted element was
"overwhelming."  *Id.* at 469-470; *see also United States v. Cotton*, 535 U.S. 625,
632-633, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002) (indictment's failure to allege a
fact that increased the statutory maximum sentence was not plain error, because the
evidence was overwhelming and essentially uncontroverted).

{¶ 35} Were this court to hold that reversal is warranted any time a structural
error has occurred, there would be no practical difference between reviewing the
error under the harmless-error and plain-error standards of review.  As the *Johnson*
court explained, "the seriousness of the error claimed does not remove
consideration of it from the ambit of the Federal Rules of Criminal Procedure."  *Id.*
at 466.  We likewise decline to elevate any class of errors beyond the application
of our plain-error rule.  And while we recognize that there may be situations in
which a structural error so affects the fairness of a judicial proceeding that reversal
is warranted despite the failure to preserve the error, this is not such a case.  Because
of the overwhelming evidence of West's guilt, he is unable to show any reasonable
probability that the outcome of his trial would have been otherwise.  He therefore
failed to establish the prejudice prong of the plain-error rule.

*State v. West*, 200 N.E.3d 1048 (2022); (Doc. 6, at PageID 235-40).

As noted above, two dissenting opinions disagreed with the Supreme Court of Ohio's

majority opinion.  (Doc. 6, at PageID 241-57 (Donnelly, J., dissenting); *id.* at PageID 257-64

(Brunner, J., dissenting; Stewart, J., joining dissent)).  In the first dissenting opinion, the justice

took issue with the majority's failure to fully evaluate whether there was plain error or whether

the trial judge's conduct was structural error.  (*Id.* at PageID 241 (Donnelly, J., dissenting)).  The

justice did not take issue with the majority applying the plain-error standard since Petitioner

failed to object to the error at trial.  (*Id.* at PageID 241-42).  The justice did, however, "believe

that there is a reasonable probability that [Petitioner] was prejudiced by the trial judge's

conduct." (*Id.* at PageID 241).  The second dissenting opinion concurred generally with the first

dissenting opinion but sought to clarify the application of the plain-error standard as it relates to

structural errors.  (*Id.* at PageID 257-64 (Brunner, J., dissenting)).

1.  **Standard of Review – Judicial Bias Claims**

A criminal defendant has a right to a fair trial, and an "impartial judge is a necessary component." *Billingslea v. Jackson*, 83 F. App'x 33, 38 (6th Cir. 2003) (citing *In re Murchison*, 349 U.S. 133, 136 (1955); *Tumey v. Ohio*, 273 U.S. 510, 532 (1927)).  Due process "requires a fair trial in a fair tribunal before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Coley v. Bagley*, 706 F.3d 741, 750 (6th Cir. 2013) (quoting *Bracy v. Gramley*, 520 U.S. 899, 904-05 (1997)).  "Judicial bias is a deep-seated favoritism or antagonism that makes fair judgment impossible." *Id.* (citing *Mayberry v. Pennsylvania*, 400 U.S. 455, 465-66 (1971)); *Liteky v. United States*, 510 U.S. 540, 555 (1994).  A biased judge creates a structural defect that "def[ies] analysis by 'harmless-error' standards." *Arizona v. Fulminante*, 499 U.S. 279, 309 (1991).

The Sixth Circuit has noted that *Liteky* establishes the prevailing standard for evaluating judicial bias claims.  *Alley v. Bell*, 307 F.3d 380, 386 (6th Cir. 2002) (citing *Liteky*, 510 U.S. at 552) (applying *Liteky* post-AEDPA).  A "judge's ordinary efforts at courtroom administration -- even a stern and short tempered judge's ordinary efforts at courtroom administration -- remain immune." *Liteky*, 510 U.S. at 556.  "[E]xpressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display" do not establish bias or partiality. *Id.* at 555-56.  The Supreme Court in *Liteky* explained:

> [O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.  Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality

17

challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible. An example of the latter (and perhaps of the former as well) is the statement that was alleged to have been made by the District Judge in *Berger v. United States*, 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481 (1921), a World War I espionage case against German–American defendants: "One must have a very judicial mind, indeed, not [to be] prejudiced against the German Americans" because their "hearts are reeking with disloyalty." *Id.*, at 28 (internal quotation marks omitted).

510 U.S. at 555.

The state trial court is afforded the presumption that the trial judge "properly discharged [his] official duties." *Bracy*, 520 U.S. at 909 (citations omitted). "The bias inquiry is objective, asking 'whether the average judge in his position is likely to be neutral, or whether there is an unconstitutional potential for bias.'" *Coley*, 706 F.3d at 750 (citations omitted). But not all claims based on a likelihood or appearance of judicial bias rise to the level of a constitutional violation. *Railey v. Webb*, 540 F.3d 393, 400 (6th Cir. 2008) (citations omitted); *Tumey*, 273 U.S. at 523 ("All questions of judicial qualification may not involve constitutional validity."). As the Sixth Circuit explained in *Alley*, "[e]xcept in extreme cases, to be actionable, bias must stem from an extra-judicial source." 307 F.3d at 388 (quoting *Liteky*, 510 U.S. at 555). In *Alley*, the petitioner alleged several judicial bias claims, including that the "judge demonstrated hostility toward his counsel and used profanity toward him," and that the "judge expressed relief upon sentencing Alley to death." *Id.* The Sixth Circuit noted that "the opinions [the trial judge] is alleged to have expressed - an unfavorable disposition toward Alley, a belief that Alley would never actually be put to death, and hostility toward Alley's trial counsel - all arose from what happened at trial." *Id.* The court concluded that "[n]one of Alley's allegations come close to stating a claim for judicial bias." *Id.*

18

### a. Structural Error

A structural error is one that "'affect[s] the framework within which the trial proceeds,' rather than being 'simply an error in the trial process itself.'" *United States v. Burton*, 802 F. App'x 896, 906 (6th Cir. 2020) (quoting *Weaver v. Massachusetts*, 582 U.S. 286, 293 (2017); *Fulminante*, 499 U.S. at 310). Judicial bias constitutes a structural error. *Id.* (quoting *United States v. Lawrence*, 735 F.3d 385, 401 (6th Cir. 2013); *Rosencrantz v. Lafler*, 568 F.3d 577, 589 (6th Cir. 2009)) ("[T]he Supreme Court has found structural errors only in a very limited class of cases." (internal quotation marks omitted)); *Tumey*, 273 U.S. at 532-34.

### b. Plain Error

The Supreme Court has held, however, that when a petitioner fails to object to an error during trial, even if a structural error, a reviewing court must apply a four-part test to determine whether the court will exercise discretion in noticing the error. *Johnson v. United States*, 520 U.S. 461, 466-67 (1997) (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)). The Sixth Circuit has explained the plain error test as follows:

> We may . . . grant relief under plain-error review only if four requirements are met: (1) there must be a legal error (objection to which was not affirmatively waived); (2) the error must be clear; (3) the error must have affected the appellant's substantial rights in that it affected the outcome of the district court proceedings; and (4) the error must have seriously affected the fairness, integrity, or public reputation of the judicial proceedings.

*Lawrence*, 735 F.3d at 401 (citing *Puckett v. United States*, 556 U.S. 129, 135 (2009)); *Johnson*, 520 U.S. at 466-67 (quoting *Olano*, 507 U.S. at 732); *Johnson v. Bradshaw*, 493 F. App'x 666, 671 (quoting *United States v. McDaniel*, 398 F.3d 540, 547 (6th Cir. 2005); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)) (reviewing a state prisoner's federal habeas claim under plain error analysis). "Meeting all four prongs is difficult, 'as it should be.'" *Lawrence*, 735 F.3d at 401

(quoting *Puckett*, 556 U.S. at 135; *United States v. Dominguez Benitez*, 542 U.S. 74, 83 n.9 (2004)).  Even if met, a reviewing court has discretion in whether to notice the error.  *Johnson*, 520 U.S. at 467 (quoting *Olano*, 507 U.S. at 732).

### 2. The Ohio State Courts Were Not Unreasonable In Finding That Petitioner's Judicial Bias Claim Lacked Merit.

As an initial matter, Petitioner contends that the Supreme Court of Ohio unreasonably applied the plain-error test, and notes that judicial bias is a structural error, which warranted automatic reversal by the state courts.  (Pet'r Br., Doc. 1-1, at PageID 23-24).  The Undersigned disagrees.

In *Johnson*, the United States Supreme Court analyzed the petitioner's "structural error" claim under the plain-error test because the petitioner failed to object to the error at trial.  520 U.S. at 468-69.  Notably, the *Johnson* Court analyzed whether the petitioner's claimed error rose to a structural error under the third prong of *Olano*—whether the error affected the petitioner's substantial rights.  *Id.* (citations omitted) (finding that failure to submit the materiality element in the jury instruction did not rise to the level of a structural error).  The Supreme Court also noted that although the petitioner complained of an alleged "structural" error, the "seriousness of the error claimed does not remove consideration of it from the ambit" of criminal procedure rules.  Therefore, any alleged "structural" error in the instant case did not warrant automatic reversal by the state courts.

Respondent asserts that if Petitioner is challenging the state court application of Ohio's plain error test under state law, then that claim is not cognizable under federal habeas review.  (Return, Doc. 7, at PageID 851-52).  Although Respondent suggests that the Supreme Court of Ohio's review of this claim under Ohio's plain error test is not cognizable in federal habeas

20

review, the Supreme Court of Ohio applied the plain error test laid out in *Johnson*, which is the same under Ohio law.  (Doc. 6, at PageID 237-38 (citing *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, at ¶ 24; *State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, at ¶ 23; *Johnson*, 520 U.S. at 465-66)).  Therefore, the Undersigned declines to find Petitioner's claim is non-cognizable under federal habeas review.

Here, as both parties agree, Petitioner failed to object to the trial judge's questioning at trial.  (Pet'r Br., Doc. 1-1, at PageID 23; Return, Doc. 7, at PageID 842-43).  The plain error analysis detailed in *Johnson*, pursuant to *Olano*, is the prevailing standard for this type of claim because Petitioner failed to object to the alleged error at trial—whether structural or otherwise. The Undersigned is unaware of, and the parties do not point to, clearly established federal law that indicates plain error analysis does not apply in this instance.  As noted, structural error claims preclude *harmless* error analysis.  *Allen v. Hawley*, 74 F. App'x 457, 468-69 (citing *Fulminante*, 499 U.S. at 309).  A preserved structural error, if found, results in automatic relief, but a forfeited structural error claim is subject to plain error analysis.  *See Johnson*, 520 U.S. at 466; *Weaver*, 582 U.S. at 301 (noting that structural error claims, such as judicial bias under *Tumey*, only "necessitated automatic reversal after they were preserved and then raised on direct appeal").  Petitioner failed to object to the judge's questioning during trial.  Accordingly, *Olano's* plain error test applies to Petitioner's forfeited structural error claim.

### a. Prongs One and Two of *Olano*

Petitioner must show that the state court decisions were unreasonable, which he has failed to do.  The first two *Olano* prongs consider whether there was an error and if so, whether that error was clear.  *Johnson*, 520 U.S. at 466-67 (quoting *Olano*, 507 U.S. at 732).  Petitioner

asserts that at the very least, the trial court's questioning constituted plain error. (Pet'r Br., Doc. 1-1, at PageID 22) ("The trial court's questioning of Mr. West amounted to structural and plain error."). The Supreme Court of Ohio failed to analyze whether there was a plain error sufficient to satisfy the first two *Olano* prongs. Instead, the Ohio Supreme Court focused primarily on the third "prejudice" prong, and it was not unreasonable to do so. *See Johnson*, 520 U.S. at 469-70 (quoting *Olano*, 507 U.S. at 736) (noting that it was not necessary to determine whether "the failure to submit materiality to the jury 'affected substantial rights'" because *all* parts of the *Olano* test must be met). In any event, this federal habeas court likely still owes deference to the state appellate court's decision on whether Petitioner demonstrated a plain error. *See, e.g.*, *Loden v. McCarty*, 778 F.3d 484, 494-95 (5th Cir. 2015) (citing *Atkins v. Zenk*, 667 F.3d 939, 944 (7th Cir. 2012)) (finding that "[w]here a lower state court ruled on an element that a higher state court did not, the lower state court's decision is entitled to AEDPA deference" in the context of an ineffective assistance of counsel claim). The state appellate court found that viewing the record as a whole, the trial judge's questioning was limited, also noting that it could not find plain error. (Doc. 6, at PageID 126). Agreeing with the State's contentions, the state appellate court pointed out that the trial court gave Petitioner warnings about testifying against his counsel's advice and that the curative instructions remedied any potential error. (*Id.*). Under the AEDPA, the state appellate court is afforded deference and the decision was not unreasonable.

### b. Prong Three of *Olano*

Because all four prongs of *Olano* must be met, *Johnson*, 520 U.S. at 469-70, the analysis could stop with a finding of no plain error. The Undersigned, however, reviews the

reasonableness of the state court decisions regarding Petitioner's claim under all four prongs. The third prong of *Olano* focuses on whether the alleged error "affects the substantial rights" of the petitioner. *Johnson*, 520 U.S. at 467-68 (quoting *Olano*, 507 U.S. at 732). The Supreme Court of the United States has explained that "[i]n the ordinary case, to meet this standard an error must be 'prejudicial,' which means that there must be a reasonable probability that the error affected the outcome of the trial." *United States v. Marcus*, 560 U.S. 258, 262 (2010) (quoting *Olano*, 507 U.S. at 734-35) (citing *United States v. Dominguez Benitez*, 542 U.S. 74, 83 (2004)). The Supreme Court has "noted the possibility that certain errors, termed 'structural errors,' might 'affec[t] substantial rights' regardless of their actual impact on an appellant's trial." *Id.* (quoting *Puckett*, 556 U.S. at 141). The Supreme Court, however, "reserv[ed] the question whether 'structural errors' automatically satisfy the third 'plain error' criterion." *Id.* (quoting *Puckett*, 556 U.S. at 141). As detailed above, the *Johnson* Court analyzed whether the petitioner's alleged error was a structural error under this third prong, 520 U.S. at 468-69, and *Liteky* is the prevailing standard for judicial bias claims. *Alley*, 307 F.3d at 386 (citing *Liteky*, 510 U.S. at 552).

The Supreme Court of Ohio applied an outcome determinative analysis to find whether but for the judge's alleged bias, the outcome of the proceeding would be different. (Doc. 6, at PageID 238-40). Although it conforms with federal law to apply the outcome determinative test according to *Johnson* and *Puckett*, the Undersigned finds it prudent to first analyze whether the trial judge's alleged bias rose to a structural error. The Supreme Court of Ohio did not focus its analysis on the trial judge's alleged bias, focusing instead on the overwhelming evidence against Petitioner (*id.*), but the state appellate court did discuss whether the trial judge's conduct

23

demonstrated bias (*id.* at PageID 126).  Generally, a federal habeas court still owes AEDPA deference to a lower state courts adjudication on the merits, even if the higher state court was silent on the issue.  *See Wilson v. Sellers*, 584 U.S. 122, 128-34 (2018) (citations omitted) (concluding that "federal habeas law employs a 'look through' presumption"); *Hoffner v. Bradshaw*, 622 F.3d 487, 505 (6th Cir. 2010) ("Because we are reviewing these claims under AEDPA, we must give the appropriate deference to "the last state court to issue a reasoned opinion on the issue.") (quoting *Payne v. Bell*, 418 F.3d 644, 660 (6th Cir. 2005); *see also Joseph v. Coyle*, 469 F.3d 441, 450 (6th Cir. 2006) (citing *Barrientes v. Johnson*, 221 F.3d 741, 779 (5th Cir. 2000) ("When the last state adjudication of the claim is silent or ambiguous, the federal court should look through to the last clear state decision on the matter.")).

The state courts were not unreasonable in determining collectively that this claim did not rise to a structural error and that any potential error did not impact the outcome of the proceedings.  Petitioner contends that the trial judge's questioning showed an apparent bias. (Pet'r Br., Doc. 1-1, at PageID 22; Traverse, Doc. 10, at PageID 870 ("The record is replete of evidence of judicial bias.")).  Specifically, Petitioner claims that "[m]ultiple times throughout the trial, the trial court interjected to either bolster the state's case, to assist the state in its cross-examination, or to directly call into question [Petitioner's] credibility."  (Traverse, Doc. 10, at PageID 867).

"[M]ost egregious," Petitioner maintains, the trial judge "blurred the lines between prosecutor and judge," particularly when "pos[ing] a question to the prosecutor, not the witness" about Petitioner's statement to police.  (*Id.*).  The trial judge told the prosecutor to move on with his cross-examination in response to the prosecutor's repeated questions about Petitioner's

opportunity to retreat from the situation, which the judge indicated had already been covered.

> MR. PIERSON: Your Honor, I'm wrapping up, if the Court will allow me a minute.
>
> THE COURT: Did he make a statement to a police officer?
>
> MR. PIERSON: He did.
>
> THE COURT: All right.  Let's move on.
>
> MR. PIERSON: So you made a statement to the police officer, right?
>
> THE DEFENDANT: Yes, sir.
>
> MR. PIERSON: All this happened.  It's all on video. We clearly see you shooting.  You made a statement to the cops, didn't you?
>
> THE DEFENDANT: Yes, sir.
>
> MR. PIERSON: And, of course, you told them you had a gun and were shooting because these guys brought a gun into the situation?
>
> THE COURT: You lied to the police, didn't you?
>
> THE DEFENDANT: Because I wanted to give myself a fighting chance in court * * * I knew if I pled guilty that day, there would be no way for me to come all the way to this point.

(Doc. 6-3, at PageID 713-14).  Petitioner also takes issue with the trial judge first suggesting that

Petitioner thought he was going to be robbed by the victim, but then later attacking Petitioner's

credibility because the victim did not use the term "rob."  (*Id.*). Petitioner further points out that

the trial judge distorted the victim's testimony by suggesting that the victim "saw Mr. West with

a gun even though he had testified that he did *not* see who picked up the two guns that fell to the

25

ground in the parking lot." (Traverse, Doc. 10, at PageID 867). In addition, the trial judge during sentencing (outside the jury's presence) pointed out that he thought Petitioner lied on the stand, speculating whether Petitioner was "out there thugging." (*Id.* at PageID 799 ("You're out there thugging. Maybe you're not a thug. I don't know.")). The trial judge also discussed how Petitioner had appeared in front of him before and was only sentenced to a term of imprisonment for 1 year: "Maybe if I had given you more time, this young man wouldn't have been shot. You know, I give people breaks, and you've had a break in front of me." (*Id.*).

Respondent maintains that the trial judge's questions were limited. Respondent alleges the trial judge's questions were based on the evidence already presented at trial, and were "directed at uncovering the facts and determining the truth." (Return, Doc. 7, at PageID 845-48).

Viewed in isolation, the trial judge's questions "might well have been intemperate," as the state appellate court found (Doc. 6, Ex. 7 at ¶ 17); the judge's questions must, however, be viewed in the context of the evidence previously presented at trial and the record as a whole and with the AEDPA deference owed to the state court. The trial judge interrupted questioning and interjected at several points throughout the trial, but the judge was reasonable in clarifying different points. *Billingslea v. Jackson*, 83 F. App'x 33, 38 (6th Cir. 2003) (assessing the reasonableness of the trial court's interruptions).

Concerning the trial judge's question to the prosecutor about Petitioner's statement to police, the record shows that other witnesses already testified to the same facts. Detective Rosch had already testified about Petitioner's statement to police, in which Petitioner claimed he never fired a gun. (Doc. 6-2, PageID 621-23 ("[Petitioner] stated that he did not know who was firing the shots.")). The detective also testified about seeing Petitioner firing the gun when reviewing

26

the surveillance footage.  (*Id.* at PageID 623 ("I saw him grab a gun and fire.")).  Detective

VanVorhis testified to the same, noting that Petitioner stated he was at the location of the

incident but was not shooting.  (*Id.* at PageID 601-03).  As Respondent points out, Petitioner

"has no basis to believe that the prosecutor would not have otherwise questioned [him] about the

discrepancy between the statement to police and his trial testimony."  (Return, Doc. 7, at PageID

844).  It was not unreasonable for the trial judge to inquire about testimony the jury already

heard.  In addition, at the beginning of trial, the trial judge informed the jury that "[s]ometimes

I'll jump in because I'm known to do that." (Doc. 6-1, at PageID 321), so the jury was aware that

the judge may interrupt during witness testimony.  Moreover, the trial judge provided the jury

with a curative instruction before deliberations and mentioned that he "can get aggravated," but

to not "take that as any indication of how" the case should be resolved.  (Doc. 6-3, at PageID 778

(noting that "[h]ow I think the case should come out has no bearing on anything.")).

     Although the trial judge interjected during Petitioner's testimony, the judge was

reasonable in clarifying the victim's words to Petitioner.  In support of his self-defense theory,

Petitioner testified that the victim stated he was going to rob Petitioner:

> [Petitioner]: . . . And right there is where you see me pull out the money right there.
> That's when he states that he would rob me.
>
> THE COURT:  So you're claiming that he said he would rob you?
>
> [Petitioner]:  Yeah.  His actual words was, "I'm gonna take that shit," is what he
> said to me.

(Doc. 6-3, at PageID 666 (describing Petitioner's testimony about the incident while talking

through the surveillance footage)).  Later, the trial judge interrupted Petitioner's testimony

asking for Petitioner to clarify that the victim did not *say* he was going to "rob" Petitioner, but

instead Petitioner "thought that's what [the victim] was implying by saying the 'N' word, and I'm going to take your money?" (*Id.* at PageID 669). Petitioner reiterated that the victim said, "I'm gonna take that shit." (*Id.*). The trial judge ensured that Petitioner was being clear about what the victim actually said. It is not apparent from the record that the trial judge was against Petitioner's self-defense theory and trying to attack his credibility; rather, the judge was clarifying the words spoken that made Petitioner believe he was going to be robbed.

Further, while Petitioner asserts the trial judge suggested that Petitioner picked up the two fallen guns, testimony and video evidence clarified the details of the incident. During direct examination, the victim explained that he was not sure who dropped the guns or who picked them up initially, but that he did see Petitioner handing off one gun and keeping the other. (Doc. 6-3, at PageID 526).

> [THE WITNESS]: Actually, I'm sorry, when Reese hit one of his guys, two guns fell from his waist and hit the ground. In the middle of all this scuffling, I want to say him and somebody else picked up the guns, or whatever they did. They dispersed them, or whatever.
>
> THE COURT: All right. Let's stop right there. So did you see who picked the guns up?
>
> THE WITNESS: I seen that -- at this point, I didn't see who picked up the guns. I didn't see exactly who picked up the guns.
>
> THE COURT: All right. Go ahead.
>
> THE WITNESS: At this point, I didn't see who exactly picked up the guns. But when I turned around, I knew that he was handing off a gun to somebody, those two guns.
>
> Q. (By Mr. Pierson) You didn't see who actually

picked them up.  You just saw one get handed to --

A. The next person.

Q. And who was that next person?

A. **It was James giving one to somebody else.**
That's all I know.

THE COURT: So you're saying **you** *saw* **the**
**defendant with two guns**, hand one to somebody,
and did he still have a gun?

THE WITNESS: That's correct.

(*Id.* at PageID 526-27 (emphasis added)).  The trial judge did not suggest Petitioner had picked

up the guns, only that Petitioner had the guns at some point after that.  As the victim's testimony

reveals, he *did* see Petitioner with a gun, he was just not clear on who first picked up the guns.

Moreover, the video footage, reviewed and discussed by multiple witnesses, showed how the

incident unfolded.  The trial judge's suggestion that Petitioner had a gun did not contradict the

victim's testimony.  Rather, the judge merely clarified that the victim saw Petitioner with a gun

regardless of who picked up the guns from the ground.  A trial judge is permitted to clarify facts

of the case.  *Billingslea*, 83 F. App'x at 38.

Regarding the statements made during sentencing, the trial judge noted, "I don't want to

sentence somebody and punish them for going to trial, but you're not going to get a minimum

sentence."  (*Id.*).  Even if the trial judge recalled the previous encounter with Petitioner, the judge

still did not enforce the maximum possible sentence.  (*Id.* at PageID 798 ("You could have killed

somebody.  That's 25 to life.  You're looking at eight, eight, that's 16, three for the WUD, three

for the gun spec.  I'm going to merge the other gun spec.  You're looking at 22 years.")).  The

judge proceeded to sentence Petitioner to a term of imprisonment of 12 years, which was 10

29

years less than the potential maximum sentence.  (*Id.* at PageID 798-800).  It was also the same

12-year sentence offered to Petitioner in a plea deal before trial.  (*Id.* at PageID 796; Doc. 6-1, at

PageID 304).  Given the objective bias standard, the Undersigned is not aware of an automatic

presumption that any time a defendant is before the same judge from a previous proceeding the

judge is biased against that defendant—the "average judge in his position is likely to be neutral."

*Coley*, 706 F.3d at 750 (citations omitted).   Regardless, the trial judge's views were not formed

from an extrajudicial source, but rather from the current and previous in court proceedings,

which further supports a finding that the trial judge's conduct does not rise to a constitutional

violation.  *Alley*, 307 F.3d at 388 ("Except in extreme cases, to be actionable, bias must stem

from an extra-judicial source.").

 While different parts of the record could be construed as bias in a vacuum, the record as a

whole does not show constitutionally impermissible judicial bias, as found by the state appellate

court.  (Doc. 6, at PageID 126).  Although the trial judge expressed some frustration, as

explained in *Liteky*, "expressions of impatience, dissatisfaction, annoyance, and even anger" do

not necessarily establish bias.  510 U.S. at 555-56.  As was the case in *Alley*, any potential bias

does not rise to the level of a structural error that so seriously affects the framework of the trial to

render it unfair or constitutionally invalid.  *Alley*, 307 F.3d at 388.  The state appellate court was

not unreasonable in determining that the trial court did not exhibit bias because of the trial

judge's limited questioning and curative instructions.  (Doc. 6, at PageID 126).

 The Supreme Court of Ohio did not focus on these details, but instead analyzed this claim

under the outcome-determinative analysis to find that Petitioner did not suffer prejudice.  (Doc.

6, at PageID 238).  The Supreme Court of Ohio pointed out how overwhelming the evidence was

against Petitioner when comparing the surveillance footage to Petitioner's "version of events." (*Id.*). The Supreme Court of Ohio concluded that "there is no reasonable probability that any comment or question by the judge affected the outcome of this case." (*Id.*). The Supreme Court of Ohio was not unreasonable in finding that any potential error did not impact the outcome of the proceedings and that Petitioner was not prejudiced by the trial judge's questioning. The state courts found that the evidence of Petitioner's conduct was overwhelming and that the trial judge's questioning was limited, meaning the Undersigned must defer to the state court decisions finding that Petitioner has not satisfied *Olano's* third prong—and neither decision was unreasonable.

### c.  Prong Four of *Olano*

Because of the deference owed to the state appellate court in determining that the alleged error does not rise to a structural error and to the Supreme Court of Ohio in finding that any error did not cause prejudice due to the overwhelming evidence against Petitioner, relief is not warranted. Under *Olano* and *Johnson*, if the first three prongs are satisfied, the reviewing court has discretion in noticing the error, but only if the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *United States v. Russell*, 26 F.4th 371, 376 (6th Cir. 2022) (quoting *Olano*, 507 U.S. at 736) ("[W]e don't automatically remedy the error."); *Johnson*, 520 U.S. at 469-70 (quoting *Olano*, 507 U.S. at 736; *Atkinson*, 297 U.S. at 160) (finding that even if the error in question "affected substantial rights," a reviewing court "must then determine whether the forfeited error 'seriously affects the fairness, integrity or public reputation of judicial proceedings' before it may exercise its discretion to correct the error.") *Olano's* fourth prong is satisfied if the error "leads a 'reasonable citizen' to 'bear a rightly

31

diminished view of the judicial process and its integrity.'" *Russell*, 26 F.4th at 378 (quoting *Rosales-Mireles v. United States*, 585 U.S. 129, 141 (2018)). "[I]n most circumstances, an error that does not affect the jury's verdict does not significantly impugn the 'fairness,' 'integrity,' or 'public reputation' of the judicial process." *United States v. Marcus*, 560 U.S. 258, 265-66 (2010) (quoting *Johnson*, 520 U.S. at 467; *United States v. Cotton*, 535 U.S. 625, 632-33 (2002)).

The state courts did not seem to analyze Petitioner's claim under this fourth prong because the first three *Olano* prongs were not met. Because reviewing courts have discretion in whether to notice a plain error, a federal habeas court would still owe AEDPA deference to the state court if it decided not to notice the error, even if the first three *Olano* prongs were satisfied. *Johnson*, 520 U.S. at 469-70. As noted above, the alleged bias here did not rise to the level of a constitutional violation that was so egregious as to warrant relief. *Alley*, 307 F.3d at 388; *Liteky*, 510 U.S. at 555-56; *Tumey*, 273 U.S. at 523. With the overwhelming evidence against Petitioner, any potential error did not affect the jury's verdict and "reasonable citizens" would not have a "diminished view" of judicial proceedings based on this outcome. *Russell*, 26 F.4th at 378 (quoting *Rosales-Mireles*, 585 U.S. at 141); *Marcus*, 560 U.S. at 265-66 (quoting *Johnson*, 520 U.S. at 467; *Cotton*, 535 U.S. at 632-33). Because the Undersigned finds that the state courts were not unreasonable in analyzing Petitioner's claim under the first three *Olano* prongs, it follows that the state courts were not unreasonable in foregoing the analysis under the fourth prong and deciding to not exercise discretion in noticing an error.

### C. Conclusion

The Supreme Court of Ohio was not unreasonable in its application of *Johnson* and

*Olano* to find that Petitioner did not suffer prejudice because of the overwhelming evidence against him.  (Doc. 6, at PageID 238).  Further, the state appellate court was not unreasonable when it found no plain error, nor when it determined that the trial judge's questions were limited and any potential issue was resolved by curative instructions.  (*Id.* at PageID 126).  The Undersigned does not disagree with, much less find unreasonable, the determination that the video evidence against Petitioner was overwhelming and that the trial judge's questions were limited in nature.  Given the deference afforded to the state courts, the Undersigned cannot find that either state court was unreasonable in ultimately concluding that any potential bias did not affect the integrity of Petitioner's trial.  *See Johnson*, 520 U.S. at 470; *Liteky*, 510 U.S. at 555-56; *Alley*, 307 F.3d at 388; *Coley*, 706 F.3d at 750.

The Undersigned therefore **RECOMMENDS** that Petitioner's ground for relief be **DENIED**.

Regarding a certificate of appealability ("COA"), as noted above, jurists of reason have found the outcome of the judicial bias issue debatable given the dissents from both the state appellate court (Doc. 6, at PageID 128-31 (Nelson, J., dissenting)), and the Supreme Court of Ohio (*id.* at PageID 241-57 (Donnelly, J., dissenting); *id.* at PageID 257-64 (Brunner, J., dissenting)).  Jurists of reason could find debatable the finding that the state courts here were not unreasonable and whether the Undersigned was correct in determining that Petitioner's judicial bias claim is without merit.  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  The Undersigned finds "substantial reason to think that the denial of relief might be incorrect."  *Moody v. United States*, 958 F.3d 485, 488 (6th Cir. 2020).  Accordingly, the Undersigned **RECOMMENDS** that a COA be issued for Petitioner's ground for relief.

33

**IT IS THEREFORE RECOMMENDED:**

1. The petition be **DENIED** with prejudice for the reasons that Petitioner's ground for relief is without merit.

2. A certificate of appealability **SHOULD ISSUE** with respect to Petitioner's ground for relief. *Slack*, 529 U.S. at 484; *Moody*, 958 F.3d at 488.

**NOTICE REGARDING OBJECTIONS**

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, of the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

**IT IS SO RECOMMENDED**.

Date: 7/30/2024

Karen L. Litkovitz
**Karen L. Litkovitz**
**United States Magistrate Judge**

34